1

1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
2
      - - - - - - - - - - - - - X
3
  UNITED STATES OF AMERICA,      : 17-CR-00224(PKC)
4                                :
                                 :
5                                :
        -against-                : United States Courthouse
6                                : Brooklyn, New York
                                 :
7                                :
  RICHARD K. LAI,                : Thursday, April 27, 2017
8                                : 12:00 p.m.
              Defendant.         :
9                                :
                                 :
10
      - - - - - - - - - - - - - X
11
            TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
12          BEFORE THE HONORABLE PAMELA K. CHEN
              UNITED STATES DISTRICT JUDGE
13
                  A P P E A R A N C E S:
14
  For the Government:  BRIDGET M. ROHDE., ESQ.
15                     United States Attorney
                       Eastern District of New York
16                       271 Cadman Plaza East
                         Brooklyn, New York 11201
17                     BY:  PAUL TUCHMANN, ESQ.
                          NADIA SHIHATA, ESQ.
18                        SARITHA KOMATIREDDY, ESQ.
                          Assistant United States Attorneys
19
  For the Defendant:   LEONARDO RAPADAS, ESQ.
20                       130 Aspinall Avenue, Suite 2A
                         Hagatna, Guam 96910
21


22
  Court Reporter:    SOPHIE NOLAN
23                   225 Cadman Plaza East/Brooklyn, NY 11201
                     NolanEDNY@aol.com
24  Proceedings recorded by mechanical stenography, transcript
  produced by Computer-Aided Transcription
25

Proceedings                                                    2

1              THE COURTROOM DEPUTY:  Criminal cause for pleading.

2      Docket, 17-cr-00224, USA versus John Doe.

3              Will the parties please state their appearances for

4      the record.

5              MR. TUCHMANN:  Good afternoon, Your Honor.  Paul

6      Tuchmann for the United States.  With me is Nadia Shihata and

7      Saritha Komatireddy.

8              MR. ABBOTT:  Good afternoon, Your Honor.  Andrew

9      Abbott from Pretrial Services.

10             MR. RAPADAS:  Good afternoon, Your Honor.  Leonard

11     Rapadas representing Mr. Lai.

12             THE COURT:  Good afternoon to both of you.

13             I want to deal with one initial matter which has to

14     do with your admission to this court.  I understand that you

15     are in the process of submitting your pro hac vice

16     application.

17             MR. RAPADAS:  Yes, I am.

18             THE COURT:  I want to set a deadline to get this

19     done.  I gather the Government doesn't have a problem with us

20     proceeding with the attorney while he is not yet admitted; is

21     that correct?

22             MR. TUCHMANN:  That is correct, Your Honor.  I'll

23     state for the record that Mr. Rapadas is a former U.S.

24     Attorney in Guam and the former Attorney General of Guam.

25             THE COURT:  The former Attorney General of Guam?

Proceedings                                          3

1          MR. RAPADAS:  The former, yes.

2          THE COURT:  Okay, he does have some qualifications.

3          MR. TUCHMANN:  It's my understanding he's admitted

4   in the District of Guam, the ninth circuit, and the Supreme

5   Court of the United States it looks like it's getting the

6   paperwork together and he is clearly qualified to practice in

7   this court.

8          THE COURT:  I gather you are waiting for some

9   certification to come through.

10         MR. RAPADAS:  It's on the way.

11         THE COURT:  How much time do you want for that?

12         MR. RAPADAS:  Your Honor, it's actually going to hit

13  the hotel tomorrow.  I have the PDF.  If the court accepts a

14  PDF --

15         THE COURT:  Why don't I give you two weeks just so

16  we have a deadline and make sure it does not fall through the

17  cracks.  Otherwise, my deputy will yell at me.  Let's set a

18  date.

19         THE COURTROOM DEPUTY:  May 11th.

20         THE COURT:  For defense counsel to submit his pro

21  hac vice application.

22         MR. RAPADAS:  Thank you, Your Honor.  Just for the

23  record, I'm already moving for pro hac vice admission.

24         THE COURT:  Okay.  I will grant that contingent upon

25  approval from the clerk's office and the review of the

Proceedings                                              4

1   paperwork, but given the representations made to me, I do not

2   have a reason to think there will be a problem.

3           MR. RAPADAS:  Thank you.

4           THE COURT:  So we are here for two reasons; one is

5   we are going to address an Information that is being filed and

6   I think a waiver of indictment as well as a plea.

7           Correct?

8           MR. TUCHMANN:  Yes, Your Honor.

9           THE COURT:  Why don't we start first with the

10  allocution regarding the Information or the advice, I guess I

11  should say.

12          Mr. Rapadas, I understand that your client, as I

13  mentioned a moment ago, wishes to waive indictment and plead

14  guilty to an Information; is that correct?

15          MR. RAPADAS:  Yes, Your Honor.

16          THE COURT:  You can have a seat throughout the

17  proceeding.

18          Now, Mr. Lai, I understand, as I just confirmed with

19  your attorney, that you wish to waive indictment and plead

20  guilty to an Information on which you are charged in this

21  matter; is that correct?

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  Now, this is a very serious decision and

24  I must make certain that you are making both the decision to

25  waive indictment and to plead guilty knowing and understanding

Proceedings                                                    5

1   your rights and the consequences of your decisions.

2            In addition to explaining the rights that you will

3   be giving up by waiving indictment and pleading guilty, there

4   are a number of questions I have to ask you to establish that

5   you are acting knowingly and voluntarily.

6            Do you understand that?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  Okay.  If you do not at any time

9   understand any of my questions, let me know and I will

10  rephrase them for you.

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  Further, if you would like to consult

13  further with your attorney, just let me know and I will give

14  you as much time as you need.

15           THE DEFENDANT:  Yes.

16           THE COURT:  Your answers to my questions have to be

17  under oath so I am going to have you stand and raise your

18  right hand.

19  R I C H A R D   K.   L A I,

20           called by the Court, having been first duly sworn,

21           was examined and testified as follows:

22           THE COURT:  You should understand, Mr. Lai, that now

23  that you are under oath if you answer any of my questions

24  falsely, and by that I mean knowing that the answer is false,

25  those answers can be used against you in a separate

Proceedings                                                6

1    prosecution for perjury or making a false statement.

2              Do you understand that?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Let's start by having you state your

5    full name for the record.

6              THE DEFENDANT:  My name is Richard K. Lai.

7              THE COURT:  How old are you?

8              THE DEFENDANT:  Fifty-five years old.

9              THE COURT:  How much formal education have you had?

10             THE DEFENDANT:  I have a bachelor's of science

11   degree in mechanical engineering.

12             THE COURT:  Have you ever been treated or

13   hospitalized for any mental illness?

14             THE DEFENDANT:  No.

15             THE COURT:  Are you currently or have you recently

16   been under the care of a doctor or a psychiatrist for any

17   reason?

18             THE DEFENDANT:  Not recently.

19             THE COURT:  When was the last time you received any

20   kind of medical or psychiatric --

21             THE DEFENDANT:  About nine months ago.

22             THE COURT:  Are you taking any medication in

23   connection with your treatment?

24             THE DEFENDANT:  Not now.

25             THE COURT:  Okay.  When did you stop?

Proceedings                                          7

1          THE DEFENDANT:  I stopped about -- I would say about

2     four or five months ago.

3          THE COURT:  Do you feel that you are suffering any

4     effects from any medication or treatment that you had as of

5     four or five months ago?

6          THE DEFENDANT:  No.

7          THE COURT:  Have you ever been treated or

8     hospitalized for any type of addiction such as drugs or

9     alcohol?

10         THE DEFENDANT:  Never.

11         THE COURT:  Have you taken any drugs, medicine or

12    pills or had any alcoholic beverages within the last two days?

13         THE DEFENDANT:  No.

14         THE COURT:  Is your mind clear today?

15         THE DEFENDANT:  Yes.

16         THE COURT:  And you understand fully why you are

17    here?

18         THE DEFENDANT:  Yes, I do.

19         THE COURT:  Mr. Lai, have you received a copy of the

20    Information in which you are charged and also which contains

21    the forfeiture allegations made against you?

22         THE DEFENDANT:  Yes, I did.

23         THE COURT:  Have you fully discussed the charges in

24    the forfeiture allegation with your attorney?

25         THE DEFENDANT:  Yes, I did.

Proceedings                                          8

1          THE COURT:  Do you know the charges that you are

2    facing?

3          THE DEFENDANT:  Yes, I do.

4          THE COURT:  Do you understand the nature of the

5    forfeiture allegations?

6          THE DEFENDANT:  Yes, I do.

7          THE COURT:  Now, instead of an indictment, these

8    felony charges have been brought by the filing of an

9    Information by the United States Attorney.  You have a

10   Constitutional right to be charged by indictment returned by a

11   grand jury, but you can waive that right and consent to being

12   charged by information that is put forth by the United States

13   attorney.

14         Unless you waive indictment though, you may not be

15   charged with a felony unless a grand jury finds, by return of

16   an indictment, that there is probable cause to believe that

17   these crimes have been committed and that they had been

18   committed by you.  Do you understand that?

19         THE DEFENDANT:  Yes, I do.

20         THE COURT:  Now, if you do not waive indictment, the

21   Government would have to present the case to a grand jury and

22   ask it to indict you in order for you to be charged with these

23   very crimes.  Do you understand that?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Now, a grand jury is composed of at

Proceedings                                                9

1  least 16 but not more than 23 persons and at least twelve of

2  those grand jurors would have to find that there is probable

3  cause to believe that you committed the crimes with which you

4  are charged.  Do you understand that?

5               THE DEFENDANT:  Yes.

6               THE COURT:  Now, the Grand Jury may or may not

7  indict you.  If you waive indictment, however, by the Grand

8  Jury the case will proceed against you on the U.S. Attorney's

9  Information alone as if you had been indicted by the Grand

10 Jury.  Do you understand that?

11              THE DEFENDANT:  Yes.

12              THE COURT:  Do you understand the right that you

13 will be giving up, Mr. Lai, by waiving indictment by a grand

14 jury?

15              THE DEFENDANT:  Yes, I do.

16              THE COURT:  And are you willing to give up that

17 right?

18              THE DEFENDANT:  Yes, I do.

19              THE COURT:  Have you discussed this decision with

20 your attorney?

21              THE DEFENDANT:  Yes, I did.

22              THE COURT:  Have any threats or promises been made

23 to induce you to waive your right to indictment by a grand

24 jury?

25              THE DEFENDANT:  No.

```
                       Proceedings                    10
```

1          THE COURT:  And are you waiving your right to

2    indictment voluntarily and of your own free will?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Mr. Rapadas, do you know of any reason

5    why your client should not waive indictment?

6          MR. RAPADAS:  No, Your Honor, not at this time.

7          THE COURT:  Mr. Lai, I understand that you have

8    executed a written waiver form; is that correct?

9          THE DEFENDANT:  Yes.

10          THE COURT:  I am looking at the document now.  I

11    will go ahead and sign that.  It's been signed by both you and

12    your counsel.

13          I do find that Mr. Lai's waiver of indictment is

14    knowing and voluntary and I, therefore, have accepted it.

15          Now, going back to the Information, you indicated,

16    Mr. Lai, that you reviewed that document and discussed it with

17    your attorney; correct?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Would you like me to read the

20    Information to you or do you waive a reading of the

21    Information?

22          THE DEFENDANT:  Not necessary.

23          MR. RAPADAS:  Your Honor, we waive.

24          THE COURT:  Just to summarize, however, you are

25    charged with three separate counts in this Information.  The

Proceedings                                        11

1    first two charge you with participating in a wire fraud

2    conspiracy and the third one charges you with willfully

3    failing to file a report to the Treasury Department regarding

4    your control or ownership of foreign bank and financial

5    accounts.

6              Are you familiar with those particular charges?

7              THE DEFENDANT:  Yes, I am.

8              THE COURT:  As I mentioned earlier, the Information

9    also contains a forfeiture allegation relating to Counts 1 and

10   2 against you.  Are you familiar with that as well?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Are you fully satisfied, Mr. Lai, with

13   the representation, counsel and advice given to you by your

14   attorney in this case?

15             THE DEFENDANT:  Yes, I do.

16             THE COURT:  And have you had sufficient opportunity

17   to discuss with him the matter of pleading guilty?

18             THE DEFENDANT:  Yes.

19             THE COURT:  As I mentioned before, you and your

20   attorney have indicated that you want to plead guilty in this

21   matter and to the Information, all three counts; is that

22   correct?

23             THE DEFENDANT:  Yes; correct.

24             THE COURT:  Mr. Rapadas, have you discussed the

25   matter of pleading guilty with your client?

Proceedings                                                    12

1      MR. RAPADAS:  Yes, I have, Your Honor.

2      THE COURT:  Does he understand the rights that he

3  will be giving up by pleading guilty?

4      MR. RAPADAS:  I believe so.

5      THE COURT:  Is he capable of understanding the

6  nature of these proceedings?

7      MR. RAPADAS:  Yes, he is, Your Honor.

8      THE COURT:  Do you have any doubts as to his

9  competence to plead guilty at this time?

10     MR. RAPADAS:  I have none.

11     THE COURT:  And have you advised him of the maximum

12  and minimum sentence that can be imposed in this case?

13     MR. RAPADAS:  Yes, I have.

14     THE COURT:  And have you discussed with him the

15  effect of the Sentencing Guidelines.

16     MR. RAPADAS:  Yes.

17     THE COURT:  Mr. Lai, I want to advise you of the

18  rights that you will be waiving by pleading guilty.  First,

19  you have a right to continue not to plead guilty.  Do you

20  understand that?

21     THE DEFENDANT:  Yes.

22     THE COURT:  No one can be forced to plead guilty.

23  If you persisted in your not guilty plea, you would have a

24  right under the Constitution and laws of the United States to

25  a speedy and public trial by jury.  Do you understand that?

Proceedings                                            13

1          THE DEFENDANT:  Yes.

2          THE COURT:  The trial you would be presumed to be

3    innocent and the Government would have to prove your guilt

4    beyond a reasonable doubt.  Do you understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  You would have the right to the

7    assistance of counsel for your defense and Mr. Rapadas would

8    continue to represent you in the trial and all other

9    proceedings related to the trial.  Do you understand that?

10         THE DEFENDANT:  Yes.

11         THE COURT:  You would have the right to see and hear

12   all witnesses and to have them cross-examined in your defense.

13   Do you understand?

14         THE DEFENDANT:  Yes.

15         THE COURT:  You would have the right not to testify

16   at the trial unless you voluntarily chose to do so in your own

17   defense.  Do you understand that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  You would have the right to compel the

20   attendance of witnesses to testify in your defense.  Do you

21   understand?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Now, if you decided not to testify or

24   not to put on any evidence at the trial, the fact that you did

25   not do so could not be used against you.

Proceedings                                    14

1           Do you understand that?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Now, by entering a guilty plea, if I

4    accept your plea there will be no trial and you will have

5    given up your right to a trial and all of these other rights

6    that I have just described.  Do you understand?

7           THE DEFENDANT:  Yes, do I.

8           THE COURT:  I will simply enter a judgment of guilt

9    on the basis of your guilty plea.  Do you understand that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  If you plead guilty, I will have to ask

12   you questions about what you did in order to satisfy myself

13   that you are, in fact, guilty of the crimes that you are

14   pleading guilty to.  Now, by answering my questions you will

15   be giving up your right against self-incrimination.

16          Do you understand that?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Do you understand each and every one of

19   the rights that I have just explained to you, Mr. Lai?

20          THE DEFENDANT:  Yes, I do.

21          THE COURT:  Are you willing to give up each and

22   every one of these rights?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Now, as I mentioned before, you have

25   indicated, as has your counsel and the Government, that you

```
                          Proceedings                    15
```

1    are pleading guilty pursuant to a plea agreement with the

2    Government and that has been marked as Court Exhibit Number 1.

3              (Court Exhibit 1, received in evidence.)

4              THE COURT:  Did you sign that agreement on the last

5    page above where your name is typed?

6              THE WITNESS:  Yes, I did.

7              THE COURT:  Did you have an opportunity to read and

8    discuss the agreement before signing it?

9              THE DEFENDANT:  Yes, I did.

10             THE COURT:  And when I say, discuss, I am sorry,

11   discuss it with your attorney.

12             THE DEFENDANT:  Yes, I did.

13             THE COURT:  Did you have sufficient time to do that?

14             THE DEFENDANT:  Yes, I do.

15             THE COURT:  Do you understand the terms of your

16   agreement?

17             THE DEFENDANT:  Yes, I do.

18             THE COURT:  Mr. Rapadas, do you feel you have had

19   sufficient time to review the plea agreement with your client?

20             MR. RAPADAS:  I believe have, Your Honor.

21             THE COURT:  Mr. Lai, do you have any questions at

22   all about the agreement?

23             THE DEFENDANT:  No, Your Honor.

24             THE COURT:  Does the agreement represent your entire

25   understanding with the Government?

Proceedings                                  16

1          THE DEFENDANT:  Yes, I do.  I mean it represents,

2     yes.

3          THE COURT:  Has anyone made any promise or assurance

4     to you that is not in the agreement to get you to accept it?

5          THE DEFENDANT:  No.

6          THE COURT:  Has anyone threatened you in any way to

7     persuade you to accept the plea agreement?

8          THE DEFENDANT:  No.

9          THE COURT:  Are you pleading guilty of your own free

10    will because you are, in fact, guilty?

11         THE DEFENDANT:  Yes, I am.

12         THE COURT:  Mr. Rapadas, were all formal plea offers

13    from the Government communicated to your client?

14         MR. RAPADAS:  Yes, they were, Your Honor.

15         THE COURT:  Mr. Lai, I am now going to advise you of

16    the potential penalties that you face by pleading guilty to

17    these three offenses.  Counts 1 and 2, as I mentioned, charge

18    you with wire fraud conspiracy.  The penalties for that crime

19    are as follows:  The maximum term of imprisonment you face on

20    each of those counts is 20 years.  There is no mandatory

21    minimum sentence.  The maximum term of supervised release that

22    you face on each of these counts is three years.

23         Now, supervised release refers to a period of time

24    when you will be subject to supervision by the Probation

25    Department and that will be after any term of imprisonment, if

Proceedings                                                    17

1    any, you serve in this case.

2              During your period of supervised release, there are

3    rules that you have to follow and if you violate any of those

4    rules, you can be sent back to prison for up to two additional

5    years; and that would be beyond whatever time you may have

6    spent in jail and it would not include any time that you may

7    have spent on supervised release.

8              Also, I could sentence you to that term without a

9    trial of any kind.  Do you understand that?

10             THE DEFENDANT:  Yes, I do.

11             THE COURT:  You also face a possible maximum fine of

12   the greater of $250,000 or twice the gross gain or loss caused

13   by your crimes as charged in Counts 1 and 2.

14             Do you understand that?

15             THE DEFENDANT:  Yes.

16             THE COURT:  You will be required to pay restitution,

17   it is mandatory, in the full amount of each victim's losses as

18   I determine at the time of sentencing for each of these

19   counts.  Do you understand?

20             THE DEFENDANT:  Yes.

21             THE COURT:  In addition, I will have to impose a

22   special assessment of $100 for each of these counts for a

23   total of $200.  Do you understand that?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Finally, as to each of these counts you

Proceedings                    18

1   face criminal forfeiture and the details about that are set

2   forth in your plea agreement in paragraphs 7 through 14.

3            Have you reviewed those with your attorney?

4            THE DEFENDANT:  Yes, I did.

5            THE COURT:  You understand that you will be subject

6   to forfeiture?

7            THE DEFENDANT:  Yes, I do.

8            THE COURT:  Turning to Count 3 which charges you

9   with failing to file a report to the Treasury Department about

10  foreign bank accounts that you controlled or owned.

11           The maximum term of imprisonment that you face for

12  that charge is ten years.  There is no minimum term of

13  imprisonment.  The maximum term of supervised release is again

14  three years and that would follow any term of imprisonment, if

15  any, that you serve.  Again, you can be sent back to prison

16  for up to two years if you violate any term of supervised

17  release.

18           Do you understand that?

19           THE DEFENDANT:  Yes, I do.

20           THE COURT:  The maximum fine you face for Count 3 is

21  $500,000 or twice the gross gain or gross loss caused by the

22  offense and you will have to pay restitution again, as set

23  forth in paragraph 3(f) of your agreement.

24           In addition, you have agreed to file amended tax

25  returns with the Guam Department of Revenue and Taxation.

Proceedings                                              19

1          Do you understand that?

2          THE DEFENDANT:  Yes, I do.

3          THE COURT:  Again, you will have to pay a special

4    assessment of $100 on this count, so the total is now $300.

5          Lastly, there is a civil monetary penalty of

6    $308,634 that will be assessed against you pursuant to your

7    plea agreement.  Do you understand that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Finally, I have to advise you that since

10   you have been charged in multiple counts, the sentence on

11   these counts could run consecutively; that means one after the

12   other.  Do you understand that?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Both are possible that they could run

15   concurrently, but I have the authority to have them run

16   end-to-end.  Do you understand that?

17         THE DEFENDANT:  Yes.

18         THE COURT:  So each maximum could be added together

19   for a total of, in theory, 50 years.  Do you understand that?

20   That would be the maximum if they were all added together.

21         THE DEFENDANT:  Yes.

22         THE COURT:  Did I miss anything?  I'll turn to the

23   Government.

24         MR. TUCHMANN:  No, Your Honor.

25         THE COURT:  Mr. Lai, do you understand all of the

Proceedings                                    20

1   possible consequences of your guilty plea to these three

2   charges?

3           THE DEFENDANT:  Yes, Your Honor.

4           THE COURT:  Let's turn now to the Advisory

5   Sentencing Guidelines.  Under the Sentencing Reform Act of

6   1984, the United States Sentencing Commission has issued

7   guidelines for judges like myself to follow in determining a

8   sentence in a criminal case.

9           These guidelines are merely advisory and I will

10  consider them along with the particular facts and

11  circumstances of your case as well as certain sentencing

12  factors that are set forth in Title 18 United States code

13  Section 3553(a) in determining your sentence.

14          You should understand, Mr. Lai, that I cannot tell

15  you and no one can predict for you what your sentence in this

16  case will be.  Do you understand that?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Have you discussed with your attorney

19  how the Advisory Sentencing Guidelines might apply to your

20  case?

21          THE DEFENDANT:  Yes, I did.

22          THE COURT:  What you should understand about the

23  guidelines is that I will not be able to determine what they

24  are until after the Probation Department prepares a

25  pre-sentence report and after you and the Government have had

Proceedings                                              21

1    a chance to review that report and make any objections to it

2    that you think are appropriate; including challenging the

3    advisory guideline range as calculated by Probation.

4              Do you understand that.

5              THE DEFENDANT:  Yes.

6              THE COURT:  You should understand that as you sit

7    here today you have no idea what your guideline range will be

8    at the time of sentencing.  Do you understand that?

9              THE DEFENDANT:  Yes.

10             THE COURT:  You also should understand that the

11   sentence I impose could be very different than what you hope

12   for or expect.  Do you understand that?

13             THE DEFENDANT:  Yes.

14             THE COURT:  If, in fact, the guideline range that's

15   applied at the time of sentencing is different than what you

16   hope for or expect, you cannot take your guilty plea back.

17             Do you understand that?

18             THE DEFENDANT:  Yes.

19             THE COURT:  And if the sentence that I impose is

20   different than what you hoped for or expect, you cannot take

21   your guilty plea back.  Do you understand that?

22             THE DEFENDANT:  Yes.

23             THE COURT:  You should also understand that there is

24   no parole in the federal system.  If you are sentenced to a

25   term of incarceration, you will not be released on parole.

Proceedings                                22

1          Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Do you have any questions, Mr. Lai,

4     about the rights that you are giving up, the punishments that

5     you face, the plea agreement, the nature of the charges or

6     anything else relating to this matter?

7          THE DEFENDANT:  No.

8          THE COURT:  Are you prepared to plead guilty?

9          Do you need any time?

10         THE DEFENDANT:  No.

11         THE COURT:  Are you prepared to plead guilty,

12    Mr. Lai?

13         THE DEFENDANT:  Yes, I am.

14         THE COURT:  Mr. Rapadas, do you know of any reason

15    why your client should not plead guilty?

16         MR. RAPADAS:  No, I don't, Your Honor.

17         THE COURT:  Let's start with Count 1 of the

18    Information which charges you with participating in a wire

19    fraud conspiracy relating to the 2011 FIFA presidential

20    election scheme.

21         Before we get to that, I have a few more questions

22    to ask you.

23         Are you making your pleas of guilt, Mr. Lai,

24    voluntarily and of your own free will?

25         THE DEFENDANT:  Yes, I do.

Proceedings                                    23

1          THE COURT:  Has anyone threatened or forced you to

2     plead guilty.

3          THE DEFENDANT:  No.

4          THE COURT:  Other than the plea agreement with the

5     Government, has anyone made you any promise that has caused

6     you to plead guilty?

7          THE DEFENDANT:  No.

8          THE COURT:  Has anyone made you any promise as to

9     what your sentence will be?

10         THE DEFENDANT:  No.

11         THE COURT:  Has anyone threatened you in order to

12    get you to plead guilty?

13         THE DEFENDANT:  No.

14         THE COURT:  Now, tell me what your own words what

15    makes you guilty of Count 1.

16         MR. RAPADAS:  Your Honor, if it please the Court,

17    Mr. Lai has a written statement he'd like to --

18         THE COURT:  Is it intended to cover all three?

19         MR. RAPADAS:  Yes, it is.

20         THE COURT:  All right.  Proceed.

21         THE DEFENDANT:  Since approximately 2001, I have

22    served as the president of Guam Football Association.  At

23    various times since 2001, I have also served on various

24    committees of the Asian Football Confederation including the

25    executive committee, the finance committee, of which I was the

Proceedings                                          24

1    chairman and the marketing committee.

2           Since 2013 I have also served on the FIFA audit and

3    compliance committee.  As an official of GFA, the AFC and

4    FIFA, I owe a fiduciary duty of loyalty to those organization.

5    I also understood that other officials of the AFC and FIFA,

6    and officials of other national soccer federations owe a

7    fiduciary duty of loyalty to the organization.

8           As related to Count 1, in about January 2011 an AFC

9    officer who has been described in the Information as

10   Co-Conspirator #1 approached me and offered me $100,000 if I

11   would serve as a consultant to his construction business in

12   connection with purchasing construction material in China.

13          At that time, I operated restaurants in Guam, and

14   while I had earned an engineering degree decades before, I had

15   never performed any kind of consulting in the construction

16   field for Co-Conspirator #1 or anyone else.

17          When Co-Conspirator #1 make his offer to me, I had

18   publicly opposed many of Co-Conspirator #1's policies and

19   practice as head of the AFC.

20          And when he announced his candidacy for the

21   president of FIFA a few months later, I understood that

22   Co-Conspirator #1 was seeking to pay me a bribe in exchange

23   for my support and my vote as president of the GFA.

24          When Co-Conspirator #1 first offered me this

25   consultant fee, I told him that I would consider it and I

Proceedings                                    25

1   asked him to send me a consultant agreement.

2          In about March 2011, Co-Conspirator #1 publicly

3   announced his candidacy for the presidency of FIFA and when I

4   saw him again I asked him for the consulting agreement we had

5   discussed before.

6          By asking him for the consulting agreement, I was

7   communicating to him that I was actively considering voting

8   for him and supporting him in candidacy for the presidency of

9   FIFA and that I was considering taking that 100,000 in

10  so-called consulting fee in exchange for my vote.

11         Co-Conspirator #1 said the consulting agreement was

12  still being prepared and that he would send it to me.

13         In April 2011, while I was at home in Guam I used an

14  online login to access information regarding to a personal

15  bank account I held in HSBC Bank in the Philippines and

16  noticed that 50,000 has been wired to that account from an

17  account in Qatar that I understood was controlled by

18  Co-Conspirator #1.

19         After I noticed this deposit, I called

20  Co-Conspirator #1 and asked him what the money was for.  He

21  said not to worry about it because the money was for the

22  consulting and that he would send me a consulting contract

23  soon.

24         I understood that Co-Conspirator #1 has sent me

25  these funds in an effort to bribe me to support him in the

Proceedings                                         26

1   upcoming FIFA presidential election and that any consulting

2   contract that he would send me would be a sham contract for

3   which I wouldn't actually do any work.

4           In early May 2011, another 50,000 was wired from an

5   account in Qatar to my is account in HSBC in Philippine and I

6   understood that Co-Conspirator #1 had sent me those funds for

7   the same reason.

8           During this period I communicated with

9   Co-Conspirator #1 about the agreement using my AOL e-mail

10  address.

11          In June 2011, it became publicly known that

12  Co-Conspirator #1 was suspended from FIFA because of bribe he

13  had offered to official of soccer federations from the

14  Caribbean to support his candidacy for FIFA president.

15          However, I kept 100,000 that Co-Conspirator #1 had

16  sent me and I never disclosed to FIFA, AFC, the GFA or any

17  other soccer organization; even though I knew that FIFA was

18  conducting investigation into Co-Conspirator #1 paying bribe

19  for presidential election votes.

20          I would received a consulting agreement from

21  Co-Conspirator #1 like he said I would.  I never performed any

22  consulting work for him or his construction company because of

23  his suspension.  Co-Conspirator #1 never actually stood for

24  election for president of FIFA.

25          THE COURT:  Let me pause you for a moment just so we

Proceedings                    27

1    have all of the relevant facts in one place.

2            Is it correct that you're waiving any challenge to

3    the venue or the statute of limitations with respect to Count

4    1?

5            MR. RAPADAS:  Yes, Your Honor.

6            THE COURT:  Do you understand, Mr. Lai, that

7    ordinarily, given the nature and the timing of the charges,

8    you might have the right to challenge the case being

9    prosecuted here, what is called venue, or it being prosecuted

10   at all because of the passage of time?

11           Do you understand that you are agreeing to waive any

12   venue or statute of limitations argument or challenge that you

13   might have?

14           THE DEFENDANT:  Yes, I do.

15           THE COURT:  With respect to Count 1?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Secondly, I want a proffer from the

18   Government.  I gather that the Government has alleged and

19   would be prepared to prove that the money that went from the

20   Qatari account to Mr. Lai's Philippines HSBC account went

21   through HSBC's corresponding account in Virginia; is that

22   right?

23           MR. TUCHMANN:  Your Honor, actually we would be

24   prepared to prove that the AOL e-mails that were sent -- as

25   part of the scheme, passed through the Eastern District of

Proceedings                                    28

1   Virginia in a server held by AOL.

2           We would also allege and prove that funds were then

3   linked to Guam afterwards as well from the Philippines.

4           THE COURT:  Okay.  I thought I saw reference to a

5   corresponding account in Virginia.  Is that not in connection

6   with Count 1.  Maybe I am mistaken.

7           MR. TUCHMANN:  I think the corresponding account --

8   there are corresponding accounts in the United States as

9   alleged, but those aren't specifically alleged to be in the

10  Eastern District of Virginia.  The Eastern District of

11  Virginia venue relates to the AOL e-mails.

12          THE COURT:  Okay, fair enough.

13          MR. TUCHMANN:  And the venue in Guam relates to the

14  defendant's presence in Guam over the course of this.

15          THE COURT:  With respect to Count 1, the connection

16  to the Eastern District of Virginia is the e-mail traffic and

17  then to the United States in general is the corresponding

18  account.

19          MR. TUCHMANN:  As well as the defendant being in

20  Guam, actually in furtherance of the conspiracy.

21          THE COURT:  Mr. Lai, you had said Co-Conspirator #1,

22  that person was the head of the AFC at the time these acts

23  happened; correct?

24          THE DEFENDANT:  Yes.

25          THE COURT:  All right.  Go ahead, you can move on to

Proceedings                                     29

1    Count 2.

2           THE DEFENDANT:  For Count 2, as it related to Count

3    2, in around May 2009 I attended the AFC conference in Kuala

4    Lumpur, Malaysia.  At that time Co-Conspirator #1 was the

5    president of AFC and a member of FIFA executive committee.

6           Co-Conspirator #1's seat on the FIFA executive

7    committee was up for a vote in 2009 at AFC Congress, with each

8    AFC member federation receiving one vote.

9           The person who was the president of the Bahrain

10   Football Federation who is described in the Information as

11   Candidate #1, ran against Co-Conspirator #1 for this position

12   on the FIFA executive committee, but Co-Conspirator #1 won by

13   a vote of 23 to 21.

14          Candidate #1's candidacy for the FIFA executive

15   committee had been supported by the president of Kuwait

16   Football Association, who is described in the Information as

17   is Co-Conspirator #2 --

18          THE COURT:  Can I stop you for one second.  The

19   president of the Kuwait --

20          THE DEFENDANT:  Kuwait.  Co-Conspirator #2 was also

21   the president of Olympic Council of Asia; one of the five

22   continental associations recognized by the International

23   Olympic Committee which governs the sport in Asia.

24          Also in the 2009 AFC Congress, Co-Conspirator #1

25   proposed the budget for AFC for the year of 2009 to 2012.  I

Proceedings                                30

1   gave a public speech at 2009 AFC Congress opposing the

2   adoption of the proposed budget and Co-Conspirator #1's

3   leadership of the AFC, but the Congress still adopted

4   Co-Conspirator #1's proposed budget even after I gave the

5   speech.

6            After I gave the speech, a person who worked for

7   Co-Conspirator #2 at the Olympic Council Asia and who also

8   have a position at the Kuwait Football Association and is

9   described in the Information as Co-Conspirator number three,

10  approached me and brought me to meet Co-Conspirator #2.

11           Co-Conspirator #2 told me that he liked my speech

12  about the budget and agreed with my opposition to

13  Co-Conspirator #1's leadership of the AFC.

14           Co-Conspirator #2 also asked me if I had been paid

15  by anyone to oppose Co-Conspirator #1 and make my speech and I

16  told him I had not.

17           Later in 2009 during a meeting with Co-Conspirator

18  #3, we discussed the fact that Co-Conspirator #1 has been

19  improperly withholding from the GFA development money that the

20  AFC should have sent to the GFA.  Co-Conspirator #3 told me

21  not to worry about the development money and that he and

22  Co-Conspirator #2 could provide us with financial support

23  instead.

24           I told him that I needed money to hire a coach for

25  the GFA and he said that he and Co-Conspirator #2 could

Proceedings                                    31

1    provide me with 200,000 for a coach.

2           But when Co-Conspirator #3 asked me for bank account

3    information regarding where the money shall be wired, he asked

4    me for the account information of my personal bank account,

5    not the Guam Football Association's bank account.

6           I gave him the account information for an account I

7    held in HSBC in Hong Kong.

8           In November 2009 he wired 200,000 from his account

9    in Kuwait to my HSBC account in Hong Kong.  Within a few weeks

10   after I received that money at the HSBC account in Hong Kong,

11   I wired 200,000 to my account at First Hawaiian Bank in Guam.

12          After I received that $200,000 wire transfer from

13   Co-Conspirator #3 in 2009, I periodically received additional

14   received wire transfer from account associated with

15   Co-Conspirator #3 into my HSBC account in Hong Kong and later

16   into account I held in Hang Seng Bank in Hong Kong.

17          I received this wire transfer after I asked

18   Co-Conspirator #3 for additional funds for coach and sometimes

19   he wired me money without my having asked for anything.

20          Both Co-Conspirator #3 and I understood that when we

21   discussed money for a coach we were both using code to discuss

22   payment for me personally.  On one occasion when I saw

23   Co-Conspirator #3, he tried to give me cash but I declined to

24   accept it because as I told him, I could not carry more than

25   $10,000 in cash back to the United States without reporting it

Proceedings                                                    32

1    to the United States government when I enter Guam.

2         In total, I received at least 770,000 in wire

3    transfers from accounts associated with Co-Conspirator #3 and

4    the OCA between November of 2009 and about the fall of 2014, I

5    understood that the source of this money was ultimately

6    Co-Conspirator #2 and on some occasion Co-Conspirator #3 told

7    me to send him an e-mail saying that I need funds so he could

8    show the e-mail to Co-Conspirator #2.  I never used any of

9    those funds to pay for a coach for Guam soccer team or for any

10   other use that benefit the GFA but rather kept them for myself

11   and never told anyone else about them.

12        After I received the first installment of those

13   funds in November 2009, I worked in concert with

14   Co-Conspirator #2 Co-Conspirator #3 to try to reduce

15   Co-Conspirator #1's influence in the AFC and try to install

16   other people who opposed Co-Conspirator #1 in position of

17   authority in FIFA.

18        And the AFC through politicking and votes for AFC

19   and FIFA positions.  I understand that money I received from

20   Co-Conspirator #2 and Co-Conspirator #3 was intended to reward

21   me for joining them in the effort and induce me to continue

22   work with them and oppose Co-Conspirator #1.

23        As part of those efforts, I advised that

24   Co-Conspirator #2, Co-Conspirator #3 and his assistant as to

25   what official of AFC Federation I believe could be persuaded

Proceedings                                      33

1    to oppose Co-Conspirator #1 and I arranged for Co-Conspirator

2    #2 and Co-Conspirator #3 to meet with those officials of AFC

3    member association.

4           After I arranged those meetings, I did not attend

5    them myself because I understood that as a result of those

6    meetings Co-Conspirator #3 would offer, pay or reach an

7    agreement to pay those AFC Federation officials in exchange

8    for their support in AFC votes and other business and I did

9    not want to know about such payment or directly witness them.

10          THE COURT:  All right.  This is your allocution for

11   Count 2?

12          THE DEFENDANT:  I still have more.

13          THE COURT:  Go ahead.

14          THE DEFENDANT:  Another part of these efforts was

15   that after Co-Conspirator #1 was suspended from soccer in

16   2011, I ensured that a thorough audit was performed of the AFC

17   financial records.  The audit uncovered the misuse of funds by

18   Co-Conspirator #1 when he was president of AFC and after this

19   report was provided to FIFA, Co-Conspirator #1 was banned for

20   life from football.

21          After that happened, a high-ranking FIFA officer met

22   with me and thanked me for my work on the audit.  That FIFA

23   officer then rewarded me for those efforts by having me

24   appointed to be the FIFA audit and compliance committee.

25          The efforts I made on behalf of Co-Conspirator #2

Proceedings                                                    34

1   and Co-Conspirator #3 to oppose Co-Conspirator #1 and his

2   faction were ultimately successful, as Candidate #1 was

3   ultimately elected president of AFC and FIFA executive

4   committee.  And Co-Conspirator #2 was elected to the -- excuse

5   me.

6            And Co-Conspirator #3 was elected to the FIFA

7   executive committee, and Co-Conspirator #1 was banned for life

8   from football.

9            I often communicated via e-mail using my personal

10   AOL e-mail address with Co-Conspirator --

11            May I have a moment?

12            THE COURT:  Sure.

13            THE DEFENDANT:  Your Honor, I make a mistake on one

14   of the paragraphs.  Can I start it over?

15            THE COURT:  Yes.  Tell me where you are starting.

16            THE DEFENDANT:  The efforts I make on behalf of

17   Co-Conspirator #2, because I confused with the numbers.

18            THE COURT:  Yes.

19            THE DEFENDANT:  So I just wanted to clarify.

20            The efforts I made on behalf of Co-Conspirator #2

21   and Co-Conspirator #3 to oppose Co-Conspirator #1 and his

22   faction were ultimately successful as Candidate #1 was

23   ultimately elected president of AFC and the FIFA Executive

24   Committee, and the Co-Conspirator #2 was elected to the FIFA

25   executive committee and Co-Conspirator #1 was banned life for

1   football, soccer.

2          I often communicate via e-mail using my personal AOL

3   e-mail address with Co-Conspirator #3 and his assistant about

4   payment I received from him and Co-Conspirator #2 and about

5   our effort to convince other AFC Federation officers to oppose

6   Co-Conspirator #1 and install such officer in position of the

7   power of AFC.

8          With respect to both of these two scams, I

9   understood that I and the soccer official who I understood

10  were to receive bribe, owed a duty of trust and loyalty to the

11  soccer federations they represent and to the AFC and FIFA, and

12  that they would violate that duty by using their position of

13  authority and trust to enrich themselves by accepting or

14  agreeing to accept bribe or kickback.

15         I did not disclose the bribe payments to FIFA, to

16  AFC or to anyone at the relevant soccer federations and I

17  understood that no one else would disclose such payment

18  either.

19         THE COURT:  Thank you, Mr. Lai.  With respect to

20  Count 2, are you waiving any venue challenge to have the case

21  brought here as opposed to the Eastern District of Virginia or

22  in Guam?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  I gather that the Government would rely

25  on the e-mail traffic or the path --

Proceedings                                    36

1          MR. TUCHMANN:  Yes, Your Honor.

2          THE COURT:  -- to establish the Eastern District of

3   Virginia venue?

4          MR. TUCHMANN:  Yes, Your Honor.

5          THE COURT:  Okay.  One other thing I wanted to

6   clarify for the record, you referenced OCA.  Is that the

7   Olympic Council of Asia?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Proceed to Count 3?

10         THE DEFENDANT:  It's about my foreign bank account

11  reporting.  Related to Count 3, since at least June of 2010 I

12  understood that because I am a U.S. citizen, if in any year I

13  owned or controlled any bank account outside the United States

14  or its territory including Guam with a combined value of more

15  than $10,000, I was required by federal law to report any such

16  bank account to my accountant who prepared my taxes so he

17  could report the account to the federal government.

18         Since at least 2009 I have owned or controlled such

19  foreign bank accounts; at various times at HSBC Bank in Hong

20  Kong, HSBC Bank in the Philippines and Hang Seng bank in Hong

21  Kong.  But because I did not want the federal government to

22  know about those accounts so I could avoid paying taxes on

23  them, so I did not tell any accountant about them.

24         THE COURT:  Is there anything else I should ask of

25  Mr. Lai?

Proceedings                                          37

1          MR. TUCHMANN:  Just, I guess, Your Honor, regarding

2     that Count 3, inquire if some of the funds that he received in

3     bribes and kickbacks went into any of those foreign accounts.

4          THE COURT:  Mr. Lai, did you understand the

5     question?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Did the money that you got from any of

8     these schemes go into those bank accounts?

9          THE DEFENDANT:  Yes, they did.

10          THE COURT:  Did, in fact, the money you discussed go

11     into each of those bank accounts, the three that you

12     described?

13          THE DEFENDANT:  I believe so.

14          THE COURT:  And those bank accounts had values of

15     $10,000 or more, or actually more than $10,000 during the

16     period of time you described, from 2009 onward?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Okay.  So as far as you knew and

19     believed, you were supposed to have reported starting in 2009

20     the fact and the balances for those accounts, those three

21     accounts, that you mentioned; is that right?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Anything else?

24          MR. TUCHMANN:  No, Your Honor.

25          THE COURT:  All right.  Based on my observations of

Proceedings                                    38

1    the defendant and his demeanor, as well as his answers to my

2    questions and the representations of his counsel, I do find

3    that Mr. Lai is fully competent and capable of entering an

4    informed plea; that he is aware of the nature of the charges

5    and the consequences of his plea and that his plea of guilt as

6    to these three offenses or counts is knowing and voluntary and

7    is supported by an independent basis in fact, as supplied by

8    his allocution with some additional representation or proffers

9    by the Government.

10           I, therefore, accept your guilty plea, Mr. Lai, as

11   to Counts 1 through 3 of the Information.  As I mentioned

12   before, a written pre-sentence report will be prepared to

13   assist me and the parties at the time of sentencing.  You will

14   be asked to give information for that report.

15           Typically that's in the form of an interview by a

16   probation officer.  My guess is that that will be conducted by

17   a probation officer in Guam, since that is where you reside.

18           You have the right to have your counsel,

19   Mr. Rapadas, participate in that interview, even if it is

20   remote.  He could probably be connected via Skype or some

21   other videoconferencing service.

22           Do you want Mr. Rapadas to participate in that

23   interview?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Okay.  You and your attorneys, as I

Proceedings                                          39

1    mentioned before, will have an opportunity to review the

2    pre-sentence report and make any objections you think are

3    appropriate, as will the Government.

4            The date for sentencing will be decided by the

5    Probation Department once they prepare that report.

6            Is there anything else that we need to address; The

7    matter of bail?

8            MR. TUCHMANN:  Yes.  Before we do that, Your Honor,

9    I have a preliminary order of forfeiture to hand up to the

10   court.

11           THE COURT:  Okay.

12           MR. TUCHMANN:  And it includes a reference to

13   defendant consenting to forfeiture of at least $870,000, as

14   well as amounts to be determined based upon some further

15   records that we are gathering.

16           THE COURT:  Are you aware of this, Mr. Rapadas, the

17   forfeiture?

18           MR. RAPADAS:  Yes, Your Honor.

19           THE COURT:  And is there any objection to this

20   order?

21           MR. RAPADAS:  No, Your Honor.

22           THE COURT:  I gather it is consistent with the plea

23   agreement?

24           MR. TUCHMANN:  Yes, Your Honor.

25           THE COURT:  I'll go ahead and sign that.

Proceedings                                          40

1          Anything else?

2          MR. TUCHMANN:  Yes, Your Honor.  With respect to

3     bond, the parties have conferred and reached an agreement.

4     There are just a couple of issues.  It's a little complicated

5     perhaps because of the defendant's residence in Guam.

6          The basic point is that we have an agreement for a

7     bond of $1 million to be supported by the signatures of the

8     defendant and his wife, as well as a condominium in the State

9     of Washington that he and his wife jointly own with a value,

10    without any mortgage, the equity of approximately $1 million

11    or a little less.

12         THE COURT:  It looks like 900,000 maybe.

13         MR. TUCHMANN:  Approximately $900,000 in equity.

14         THE COURT:  And that's co-owned by the wife and the

15    defendant?

16         MR. TUCHMANN:  Correct.  Yes, Your Honor.  The wife

17    will also sign the bond.

18         THE COURT:  In Guam?

19         MR. TUCHMANN:  She's actually in the State of

20    Washington and what we're going to try and do is have her sign

21    it at federal court walk-in in Seattle tomorrow or today --

22    either today or tomorrow hopefully.

23         Hopefully we can get that done today, if not

24    tomorrow.  If not, then perhaps in Guam the following week,

25    where the defendant and his wife will be.  So what I would

SN        OCR        RPR

Proceedings                    41

1  suggest is that we give the defendant and his wife a week to

2  have the wife sign the bond whether in Washington or in Guam.

3           THE COURT:  Okay.

4           MR. TUCHMANN:  And --

5           THE COURT:  Conditions?

6           MR. TUCHMANN:  The conditions, I was wondering about

7  that.  We don't have a date for a -- I'm not familiar and I

8  don't believe Mr. Rapadas is familiar yet or perhaps has

9  recently become familiar with the process of obtaining a

10 Confession of Judgment on property in the State of Washington

11 where the property is.

12          MR. RAPADAS:  For the record, I'm in communication

13 with a law firm out there that's very familiar with it and

14 they will be working with me on that.

15          THE COURT:  How much time do you want for that?  Two

16 weeks?

17          MR. RAPADAS:  Let's say two weeks, but we're going

18 to try to get it done tomorrow.  We're going to try.

19          MR. TUCHMANN:  To be safe, let's say two weeks then

20 which is -- two weeks from today is --

21          THE COURTROOM DEPUTY:  May 11th.

22          THE COURT:  Let's make a single deadline for the

23 wife to sign the bond as well as the Confession of Judgment to

24 be filed.

25          MR. TUCHMANN:  Sure.  Okay.  There's no date for the

Proceedings                                              42

1   wife to sign here, but that will be incorporated in whatever

2   order Your Honor issues now.

3          THE COURT:  Correct.  So May 11th.

4          MR. TUCHMANN:  So with respect to the defendants,

5   the bond conditions, just that he be placed under supervision

6   of Pretrial Services as directed by Pretrial Services and any

7   particular conditions regarding that.

8          With respect to the location we have an attachment

9   we've written out which we would attach to the bond which

10  proposes that the defendant report to Pretrial Services in

11  Guam on or before May 8th.

12         THE COURT:  Okay.

13         MR. TUCHMANN:  At which time he will surrender all

14  of his passports to that office, including the U.S. passport

15  and also the Hong Kong passport which he will surrender at

16  that time.

17         THE COURT:  Let me ask a question that I feel like I

18  should know the answer to, but does someone who lives in Guam

19  need passport to travel to the continental U.S.?

20         MR. TUCHMANN:  Yes, Your Honor.  My understanding as

21  it's been represented to me, it's not technically but

22  practically, yes.  I'll go into that with the conditions that

23  we propose; that the defendant reside in Guam and be

24  supervised by Pretrial Services there; that without prior

25  permission of the court or Pretrial Services, he may travel to

Proceedings                                    43

1   Hawaii, California, Oregon, the State of Washington, the

2   Eastern and Southern Districts of New York and the District of

3   New Jersey.

4           And that also without prior permission of the court

5   that he may retrieve his U.S. passport from Pretrial Services

6   in Guam for the purpose of traveling to those locations.

7           THE COURT:  But for no other purpose?

8           MR. TUCHMANN:  Correct, if he provides the Pretrial

9   Services officer in Guam his travel itinerary showing he's

10  going to those locations.  The travel to those locations may

11  also include a transit stop of up to 24 hours in Japan.  I've

12  come to learn that geographically often travel from Guam to

13  the continental United States involves a stop in Japan.

14          Again, it's a transit stop and it must be listed on

15  the travel itinerary to be provided to Pretrial Services.

16          Court permission is required for any other release

17  of the defendant's U.S. passport or for travel other than

18  those specified listed in three and four, which is those

19  locations.

20          THE COURT:  Otherwise, the Government is not seeking

21  any other restrictions such as curfew or anything else while

22  he's in Guam?

23          MR. TUCHMANN:  No, Your Honor.

24          THE COURT:  All right.  I gather that is your

25  understanding as well?

Proceedings                                         44

1          MR. RAPADAS:  Yes, Your Honor.  He's an active

2    businessman and he needs to be running his business.

3    Sometimes it takes him certain past dates and times.

4          I want to be clear though, I want to make sure that

5    that first "without permission" condition was -- I think I was

6    hearing that, and it may be only to -- for certain reasons.

7          MR. TUCHMANN:  No.

8          MR. RAPADAS:  I want to make sure he could travel

9    freely.

10          MR. TUCHMANN:  Within those locations without prior

11   permission.

12          THE COURT:  I am so glad the two of you understand

13   each other because there isn't a full sentence.

14          MR. TUCHMANN:  Your Honor, there's one other issue

15   regarding that, the location, and I have a letter to be filed

16   under seal.  I'll hand up a copy by hand regarding travel that

17   defendant had already planned to take outside the country

18   before May 8th and so if I can hand up a copy to the court.

19          THE COURT:  That the Government does not oppose.

20          MR. TUCHMANN:  The Government does not oppose, but

21   we would just get court permission pursuant to that letter.

22          THE COURT:  All right.  Because he is not reporting

23   to Pretrial Services until May 8th?

24          MR. TUCHMANN:  Correct.

25          THE COURT:  Understood.  I am going to adopt the

Proceedings                                        45

1   bail package proposed by the Government with the deadline of

2   May 11th for the filing of the Confession of Judgment as well

3   as the signature of the wife on the bond in Guam or in the

4   State of Washington.

5           I have also signed the preliminary forfeiture order

6   or the order of forfeiture, and I am going to allow the

7   request of Mr. Lai to travel before May 8th, and that will be

8   docketed today as well under seal.

9           I'm going to return to the Government, or have

10  already returned to the Government, the plea agreement.

11          MR. TUCHMANN:  And for the bond, Your Honor, the

12  defendant just needs to sign.  I think it should be set

13  though.

14          THE COURT:  I will take a look and then I will sign

15  that.

16          I think that covers everything, right?  Does that

17  cover everything?

18          MR. TUCHMANN:  Yes, Your Honor.

19          THE COURT:  The Pretrial Services officer is

20  patiently waiting to say something here.

21          You are going to get a copy of this?

22          MR. ABBOTT:  Yes, Your Honor.

23          THE COURT:  I'm going to endorse the bail release

24  form.

25          MR. TUCHMANN:  Regarding Mr. Lai's wife's signature,

46

1    I think Mr. Rapadas should coordinate with the clerk's office

2    here to coordinate with the clerk's office in the court in

3    Washington to arrange for that or in Guam.

4             THE COURT:  That's fine.  Pursuant to this she is

5    allowed to sign in either Guam or in the State of Washington.

6             MR. TUCHMANN:  Yes.

7             THE COURT:  I am sure you will work all of that out.

8             Thank you, everyone.  Are we good?

9             MR. TUCHMANN:  Yes, Your Honor.

10            MR. RAPADAS:  Yes.

11            THE COURT:  Good luck, Mr. Lai.

12            THE DEFENDANT:  Thank you.

13            THE COURT:  Yes, go ahead, Mr. Tuchmann.

14            MR. TUCHMANN:  The Government moves for the court at

15   this time to replace John Doe in the caption of this case with

16   the defendant's name.

17            THE COURT:  Any objection?

18            MR. RAPADAS:  No, Your Honor.

19            THE COURT:  That will be done.

20            (Matter concludes.)

21                          oooOooo

22    I (we) certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
23

      /s/ Sophie Nolan                 April 28, 2017
24      SOPHIE NOLAN                        Date

25

                        SN      OCR      RPR